(No. 20126.— )

THE SANITARY DISTRICT OF CHICAGO, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(RUTHERFORD B. ENGLISH, Defendant in Error.)

*Opinion filed February 18, 1931—Rehearing denied April 9, 1931.*

WALTER E. BEEBE, (ALFRED M. LOESER, of counsel,) for plaintiff in error.

ELMER A. JOHNSON, for defendant in error.

Mr. COMMISSIONER PARTLOW reported this opinion:

Defendant in error, Rutherford B. English, on March 12, 1929, made application to the Industrial Commission for an award against plaintiff in error, the Sanitary District of Chicago, for personal injuries. The arbitrator found that he was entitled to $14 per week for 267 weeks, $12 for one week, and a pension of $25 per month for life. The award was confirmed by the Industrial Commission and by the circuit court of Cook county, and the case comes to this court on a writ of error.

Several grounds of reversal are urged, but it will be necessary to consider only one of them, namely, whether or not the award is sustained by the evidence.

English was forty-nine years of age. He had been a locomotive fireman for about four years, a clothing cutter for about twenty years, a painter for seven or eight years and had been in the navy. With the exception of a few months he had been in the employ of the sanitary district since April, 1924. Most of that time he received $300 per month, but after January, 1928, he received $325 per month, and he was paid until June 7, 1928. On May 25, 1927, and for about two weeks prior thereto, he and other men had been repairing and painting a yacht belonging to the sanitary district, located at Thirty-first street and Western avenue. On the latter date he was standing in a flat-bottom boat at the stern of the yacht, painting a name on the vessel. The wind blew the boat in which he was standing and he fell into the water. He was a good swimmer and had been in the water the day before. He was in the water about a half minute when two fellow-workmen pulled him out. The day was fairly warm. He was taken into the cabin of the yacht, where there was a lighted cook stove. His wet clothes were taken off, he put on dry clothes, his wet clothes were dried in about an hour and a half, and he was taken home. He claims that as a result of the fall into the water he received such an injury and shock as totally incapacitated him and now confines him to his home and to his bed a greater portion of the time. After he got home he complained of having swallowed some water, and he complained of pains in his stomach, of shaking, trembling and feeling chilly. In the fall he received a slight cut on his right leg. Dr. Goodman dressed the leg the day after the injury and gave him an injection of typhoid serum. Dr. Griffith, his family physician, looked after him after that time. He returned to his work in about a week and continued in various employment until November, 1927, when

he quit work and did not work for the district after that time. He claims he was not able to work after November, 1927. In June, 1928, while putting a screen in a window in his house he fell out of the window, struck his head against a stone window ledge and made a wound which had to be closed with five or six stitches. On September 21, 1927, he went to the Mayo Hospital for three days. During the summer of 1928 he visited a doctor in St. Louis.

Dr. Griffith testified that he had been the family physician for English for about fifteen years. He treated him for mal-nutrition. The case was diagnosed as lead poisoning, evidenced by discoloration of the gums. He was anæmic and nervous and had tremor of the hands six months before the accident. His weight at that time was between 135 and 140 pounds. Years before his weight had been 155 to 160 pounds. The doctor saw the patient once each month at his office. The treatment was for the purpose of building up the blood and curing the tremor. The patient did not respond to the treatment and his condition became progressively worse. He became chronically tired and nervous, which condition continued during the six months. The doctor testified that English called at his office a week or ten days after the accident. At that time he was run down, highly nervous, anæmic, had neuritis, and the doctor immuned him for typhoid fever. The doctor was not able to determine what caused this condition. He took English to a hospital and had a urine analysis and blood count. He told him he ought to have a Wasserman test, but he left the hospital the next night, before the test was made.

Dr. Scott, a specialist in treatment of traumatic cases, testified that he examined English on March 11, 1929, at his home. He found a marked increase in the deep reflexes bi-laterally and the patient was highly emotional and had an ataxic gait. A hypothetical question was put to the doc-

tor covering many of the facts above stated, and he was asked whether he had an opinion, with a reasonable degree of medical certainty, as to whether there was a causal relationship between the accident of May 25, 1927, and the ill-being as stated in the hypothetical question. An objection to the question was overruled. His answer was that there might or could be a direct causal connection between the accident and the condition described in the hypothetical question. He testified that his answer was based on the conditions stated in the question and he made a personal diagnosis of the case. He found no sign of a syphilitic condition. On cross-examination he testified that he got a history of the case from English from the time of the accident to the date of the examination; that he did not say anything about having been sick or under a doctor's care before the accident; that he said he was a little nervous before that time; that he did not tell the doctor his blood count was low or that he was anæmic before the accident but did say he was nervous. He told the witness he had been able to carry on strenuous work for six months before the accident. The doctor got the history of the case from Dr. Griffith.

Dr. Stevens testified that on March 14, 1929, he made an examination of English at his home and told of the conditions which he found at that time. He was asked a hypothetical question substantially the same as the question put to Dr. Scott, and his reply was that there could be a causal relation between the facts as outlined in the hypothetical question and English's present condition. He testified that from the fact, as he had been informed, that English's decline began after the accident, the submerging in the water of the canal could, with reasonable medical certainty, aggravate a pre-existing nervous tension and increase it to a point where eventually he became disabled. On cross-examination he testified that English did not tell him he had a tremor of the hands before the accident or that he

was anæmic or that he felt tired prior to the accident; that he said he felt highly nervous, upset and uneasy, and that he had difficulty in doing his work as he felt he should do it. The doctor testified that the ataxic gait might be due to syphilis, and a spinal test would be the means of determining whether or not English had syphilis, and if it was positive it would be conclusive; that a period of immersion in the water would make a difference if the temperature of the water was below the temperature of the air; that the fact that English fell out of the window and sustained an injury was not stated in the hypothetical question and he did not take that fact into consideration in his answer. He testified that he suggested that English take a test for syphilis; that the fact that Dr. Griffith sent him to a laboratory a year before and that the man left the laboratory before the test was made would be important in making a complete diagnosis.

Dr. Goodman testified that he treated English at his home on the day after the accident; that there was an abrasion about one inch up and down and about one inch across about the center of the middle of the right leg; that he examined him on April 29, 1929, and asked him how his leg was getting along, and he showed witness a scar on his left leg, which witness took for granted was the original abrasion but that it was not the scar; that the original injury, according to his record, was on the right shin. He testified that he examined him in June, 1927, and he appeared somewhat underweight and peculiar. A hypothetical question was put to the doctor containing the facts with reference to the accident, and he was asked whether he had an opinion, based on a degree of medical certainty, as to what was the matter with this man. He replied that from the hypothetical question put to him, in his opinion the man was suffering from anæmia and from some nervous disorder; that the injury to the head would be sufficient trauma to incite any pathological or organic condition that

might have been there previously; that the tremor involving the nervous system is one of the findings of syphilis; that the failure or sluggishness of the pupils to re-act, the sluggish speech and the difficulty in the protrusion of the tongue are findings in cerebral spinal lues. In his opinion the immersion in the water could not have brought about the condition found.

The burden of proof was upon English to prove the causal connection between the alleged injury and the resulting condition. (*Sears, Roebuck & Co.* v. *Industrial Com.* 334 Ill. 246; *Freeman Coal Co.* v. *Industrial Com.* 315 id. 84.) The liability cannot rest upon imagination, speculation or conjecture but must be based upon facts established by a preponderance of the evidence. (*Springfield District Coal Co.* v. *Industrial Com.* 303 Ill. 528; *Decatur Construction Co.* v. *Industrial Com.* 296 id. 290; *St. Louis Smelting Co.* v. *Industrial Com.* 298 id. 272.) It cannot rest upon a choice between two views equally compatible with the evidence. (*Carson-Payson Co.* v. *Industrial Com.* 340 Ill. 632; *Green* v. *Industrial Com.* 337 id. 514; *Berry* v. *Industrial Com.* 335 id. 374; *Railroad Water Co.* v. *Industrial Com.* 334 id. 52; *Byram* v. *Industrial Com.* 333 id. 152.) There can be no award where the condition results from a pre-existing disease and not from an injury. (*St. Louis Smelting Co.* v. *Industrial Com. supra.*) Where an employee suffers a disability and has a pre-existing disease which is aggravated or accelerated by the accidental injury and thereby produces a disability, the disability is caused by the accidental injury and the employee is entitled to compensation. (*Powers Storage Co.* v. *Industrial Com.* 340 Ill. 498; *Great Lakes Supply Co.* v. *Industrial Com.* 309 id. 68; *Jones Foundry Co.* v. *Industrial Com.* 303 id. 410.) It is not the province of the court to substitute its judgment for that of the commission unless the court can see that the finding of the commission was clearly and manifestly against the weight of the evidence. *County of Cook* v. *Industrial Com.*

327 Ill. 79; *Armour Grain Co.* v. *Industrial Com.* 323 id. 80; *Superior Coal Co.* v. *Industrial Com.* 318 id. 328.

The undisputed evidence is that several months before the alleged injury English was treated for mal-nutrition. The case was diagnosed as lead poisoning. He was anæmic, nervous, had tremor in the hands, his weight had decreased, and he was treated for these troubles and did not respond but grew steadily worse. There is no controversy as to his present condition, so the question is whether the evidence shows a causal connection between the accident and the present condition. Dr. Griffith testified that he was not able to determine what caused the disability. Dr. Goodman testified that in his opinion the man was suffering from anæmia and from some nervous disorder, and that the injury to the head would be sufficient trauma to incite any pathological or organic condition that might have been there previously; that the tremor involved the nervous system and was one of the findings of syphilis, and that there were other evidences of syphilis. He testified that the immersion in the water could not have brought on the condition found. Both of these physicians had attended English at different times.

Objections were made to the hypothetical questions put to Drs. Scott and Stevens on the ground that they did not include all of the essential elements shown by the evidence, but the objections were overruled. If the facts are disputed the party examining the witness may include in the hypothetical question only those facts which the evidence on his side tends to prove, but where the evidence as to the particular matter inquired into is not in dispute the question must contain all of the facts. (*People* v. *Geary,* 297 Ill. 608; *Opp* v. *Pryor,* 294 id. 538; *Fuchs* v. *Tone,* 218 id. 445.) In *McCarthy* v. *Spring Valley Coal Co.* 232 Ill. 473, it was held that a hypothetical question must not ignore material facts which affect the opinion.

The hypothetical question put to Dr. Scott omitted to state the exact condition of English during the six months prior to the accident and what treatment was given him. It omitted to state that there was no improvement during that time and that his condition grew worse rather than better. It omitted to state that when he fell out of the window he struck his head against a stone window ledge and that the wound had to be closed with several stitches. The question did not state what kind of a day it was on May 25, 1927, when he fell into the water, how long he was in the water or how he changed his clothes. It omitted to state that the evidence showed that he weighed from 135 to 140 pounds six months prior to the accident. It did state that he claimed that he weighed 155 to 160 pounds on May 25, 1927, and that his weight steadily decreased until at the time of the hearing he weighed 134 pounds. The question put to Dr. Stevens was even more meager than the question put to Dr. Scott. Both questions ignored material, undisputed facts which would affect the opinion, and the objections should have been sustained to the questions.

The answer of Dr. Scott to the hypothetical question was, that there might or could be a direct causal connection between the accident and the condition described in the hypothetical question. He did not answer that there was a causal connection but simply that there might or could be one. Dr. Stevens' answer was substantially the same. In *Sears, Roebuck & Co.* v. *Industrial Com. supra,* on page 254, it was said: "It is very clear from the testimony of all the doctors that in concluding that there was a causative relation of the accidental injury to the death the witnesses were considering mere possibilities." That fact is true in this case, and this evidence was not sufficient, under the law, to establish a connection between the injury and the subsequent condition of English.

Dr. Scott and Dr. Stevens both testified that at the time they made their examination of English he told them vari-

ous facts as to his condition, and that they took those facts into consideration in determining his condition. It is apparent from their testimony that English did not tell them all of the facts as to his condition. In *Lehigh Stone Co. v. Industrial Com.* 315 Ill. 431, it was held that an opinion of a physician who had not treated the injured employee but had examined him for the purpose of testifying as to the cause of his condition is not competent where it develops, on cross-examination, that the opinion of the witness was not based wholly on his examination but was partly based upon the history of the case, and that a motion to exclude the opinion of the witness was proper at the close of the testimony although no objection was made when the opinion was given on direct examination. The testimony of both of these doctors relative to their personal examinations was not based entirely upon objective symptoms but upon the history of the case given them by English and by Dr. Griffith. This evidence was incompetent and was not sufficient to sustain the award.

It is apparent that English was in bad physical condition for several months prior to the accident, and it is highly improbable that falling into the water for a half minute would so injure him as to render his present condition possible, especially in the face of the fact that after his injury he within a week returned to work and worked for six months, apparently without very much complaint, and subsequently received other injuries more serious than the one here under consideration.

The award is contrary to the manifest weight of the evidence, and the judgment is reversed and the cause remanded, with directions to set aside the award.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*